## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

BOTSFORD GENERAL HOSPITAL
d/b/a Beaumont Health – Farmington Hills
28050 Grand River Avenue
Farmington Hills, MI 48336

and

ALAMANCE REGIONAL MEDICAL
CENTER, INC.
1240 Huffman Mill Road
Burlington, NC 27215

and

FLAGLER HOSPITAL, INC.
d/b/a UF Health Flagler Hospital, Flagler
Hospital
400 Health Park Boulevard
Saint Augustine, FL 32086

and

FLORIDA HEALTH SCIENCES CENTER,
INC.
d/b/a Tampa General Hospital
One Tampa General Circle
Tampa, FL 33606

and

HARTFORD HOSPITAL
80 Seymour Street
Hartford, CT 06106

and

HONORHEALTH DEER VALLEY MEDICAL
CENTER
19829 North 27th Avenue
Phoenix, AZ 85027

Case No. 1:26-cv-02179

and

HONORHEALTH JOHN C. LINCOLN
MEDICAL CENTER
d/b/a Scottsdale Lincoln Health Network
250 East Dunlap Avenue
Phoenix, AZ 85020

and

HONORHEALTH SCOTTSDALE OSBORN
MEDICAL CENTER
d/b/a SHC Osborn Medical Center
7400 East Osborn Road
Scottsdale, AZ 85251

and

HONORHEALTH SCOTTSDALE SHEA
MEDICAL CENTER
d/b/a SHC Shea Medical Center
9003 East Shea Boulevard
Scottsdale, AZ 85260

and

HUNTINGTON HOSPITAL
100 West California Boulevard
Pasadena, CA 91105

and

MAYO CLINIC ARIZONA
d/b/a Mayo Clinic Hospital
5777 East Mayo Boulevard
Phoenix, AZ 85054

and

METROPOLITAN HOSPITAL
d/b/a University of Michigan Health – West
5900 Byron Center Avenue
Wyoming, MI 49519

and

2

MILTON S. HERSHEY MEDICAL CENTER
d/b/a Penn State Health Milton S. Hershey
Medical Center
500 University Drive
Hershey, PA 17033

and

NAPLES COMMUNITY HOSPITAL
350 7th Street North
Naples, FL 34102

and

OAKWOOD HEALTHCARE, INC.
d/b/a Beaumont Health – Dearborn
18101 Oakwood Boulevard
Dearborn, MI 48124

and

PALMETTO RICHLAND
d/b/a Prisma Health Richland Hospital
5 Richland Medical Park Drive
Columbia, SC 29203

and

SHANDS JACKSONVILLE MEDICAL
CENTER, INC.
d/b/a UF Health Jacksonville
655 West Eighth Street
Jacksonville, FL 32209

and

SHANDS TEACHING HOSPITAL AND
CLINICS, INC.
d/b/a UF Health Shands Florida; UF Health
Shands
1600 Southwest Archer Road
Gainesville, FL 32608

and

3

SPARTANBURG MEDICAL CENTER
101 East Wood Street
Spartanburg, SC 29303

and

SPECTRUM HEALTH HOSPITALS
d/b/a Spectrum Health Butterworth Campus
100 Michigan Street Northeast
Grand Rapids, MI 49503

and

ST. JOHN MEDICAL CENTER
d/b/a UH St. John Medical Center
29000 Center Ridge Road
Westlake, OH 44145

and

ST. JOSEPH REGIONAL HEALTH
NETWORK
d/b/a St. Joseph Medical Center
2500 Bernville Road
Reading, PA 19603

and

ST. VINCENT'S MEDICAL CENTER
2800 Main Street
Bridgeport, CT 06606

and

THE HOSPITAL OF CENTRAL
CONNECTICUT
d/b/a Hospital of Central Connecticut
100 Grand Street
New Britain, CT 06052

and

THE MOSES H. CONE MEMORIAL
HOSPITAL OPERATING CORPORATION
d/b/a The Moses H. Cone Memorial Hospital
1200 North Elm Street
Greensboro, NC 27401

and

THE WILLIAM W. BACKUS HOSPITAL
326 Washington Street
Norwich, CT 06360

and

UH CLEVELAND MEDICAL CENTER
d/b/a UH Case Medical Center
11100 Euclid Avenue
Cleveland, OH 44106

and

UH GEAUGA MEDICAL CENTER
13207 Ravenna Road
Chardon, OH 44024

and

UH REGIONAL HOSPITALS
d/b/a UH Richmond Medical Center
27100 Chardon Road
Richmond Heights, OH 44143

and

WILLIAM BEAUMONT HOSPITAL
d/b/a Beaumont Health – Royal Oak
3601 West 13 Mile Road
Royal Oak, MI 48085

and

WILLIAM BEAUMONT HOSPITAL
d/b/a Beaumont Health – Troy
44201 Dequindre Road
Troy, MI 48073

       Plaintiffs,

v.

ROBERT F. KENNEDY, JR.,
in his official capacity as
Secretary of the United States
Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

       Defendant.

## COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY RELIEF AND SUMS DUE UNDER THE MEDICARE STATUTE

### INTRODUCTION

1.    The above-captioned Plaintiffs bring this civil action to obtain judicial review of agency decisions regarding Medicare reimbursements rendered by Robert F. Kennedy, Jr. (the "Secretary" or "Defendant") in his official capacity as the Secretary of the United States Department of Health and Human Services.

2.    The Medicare statute provides for payments for two types of hospital costs on a prospective payment basis, specifically, operating and capital related costs.  42 U.S.C. § 1395ww(d), (g).  At issue is a type of capital cost payment.

3.    In addition to a per discharge capital cost payment, the Secretary may provide a capital adjustment "to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located."  42 U.S.C. § 1395ww(g)(1)(B)(ii).  The Secretary did in fact adopt such an adjustment, known as the capital

6

disproportionate share hospital ("DSH") adjustment.    However, in 2006, the Secretary promulgated a regulation that denied that adjustment to certain hospitals, for reasons that had no relation to their costs.  *See* 42 C.F.R. § 412.320(a)(1)(iii).

4.      This 2006 rule affected only hospitals that elected to acquire "rural" status for purposes of the operating cost prospective payment methodology.

5.      The Secretary had no authority under the applicable statute to adopt and implement this regulation.  Plaintiffs seek an order setting aside the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii) and its application against the Plaintiff providers, which unlawfully reduces Plaintiffs' capital payments by denying them a capital DSH adjustment.

6.      The Secretary's adoption and application of this regulation violates the plain language and purpose of the Medicare statute and the Administrative Procedure Act ("APA").

7.      Accordingly, Plaintiffs ask this Court to reverse the Secretary's final agency decisions and to order the Secretary to recalculate Plaintiffs' capital DSH payments as required by statute.

**JURISDICTION AND VENUE**

8.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (the "Medicare statute"), which establishes the Medicare program, and the APA, 5 U.S.C. § 551 *et seq.*

9.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which grants Medicare providers the right to obtain expedited judicial review ("EJR") of any action involving "a question of law or regulations relevant to the matters in controversy" when the Secretary's Provider Reimbursement Review Board (the "Board") "determines . . . that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of

such determination is received."  The Board granted EJR to Plaintiffs in decisions dated November 25, 2025, and January 6, 2026.  Accordingly, this action is timely filed within the sixty-day period established at 42 U.S.C. § 1395oo(f)(1).  Plaintiffs have exhausted all administrative remedies prior to commencing this action.

10.    Venue in this Court is proper under 42 U.S.C. § 1395oo(f)(1).

## PARTIES

11.    The Plaintiffs in this action are Medicare participating hospitals.  They are listed below with their Medicare provider numbers and their cost reporting periods at issue in this action, as set forth in their administrative appeals[1]:

a) Alamance Regional Medical Center, Inc. ("Alamance Regional Medical Center"), Provider No. 34-0070 for the fiscal year ending September 30, 2022;

b) Botsford General Hospital d/b/a Beaumont Health – Farmington Hills ("Beaumont Health – Farmington Hills"), Provider No. 23-0151 for the fiscal year ending December 31, 2021;

c) Flagler Hospital, Inc. d/b/a UF Health Flagler Hospital, Flagler Hospital ("Flagler Hospital"), Provider No. 10-0090 for the fiscal years ending September 30, 2018 and September 30, 2020;

d) Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital ("Tampa General Hospital"), Provider No. 10-0128 for the fiscal year ending September 30, 2020;

e) Hartford Hospital, Provider No. 07-0025 for the fiscal year ending September 30, 2022;

f) HonorHealth Deer Valley Medical Center ("Deer Valley Medical Center"), Provider No. 03-0092 for the fiscal year ending December 31, 2022;

g) HonorHealth John C. Lincoln Medical Center d/b/a Scottsdale Lincoln Health Network, John C. Lincoln Hospital - North Mountain, John C. Lincoln North Mountain Hospital, Scottsdale Healthcare Hospitals, John C. Lincoln Health Network, SHC John C. Lincoln North Mountain ("Lincoln Medical Center"), Provider No. 03-0014 for the fiscal year ending December 31, 2022;

---

[1] As hospital names may have changed over the years, a hospital may be definitely identified by its Medicare provider number.

8

h) HonorHealth Scottsdale Osborn Medical Center d/b/a Scottsdale Healthcare Hospitals, Scottsdale Lincoln Health Network, SHC Osborn Medical Center, Osborn Medical Center ("Osborn Medical Center"), Provider No. 03-0038 for the fiscal year ending December 31, 2022;

i) HonorHealth Scottsdale Shea Medical Center d/b/a Scottsdale Healthcare Hospitals, Scottsdale Lincoln Health Network, SHC Shea Medical Center ("Shea Medical Center"), Provider No. 03-0087 for the fiscal year ending December 31, 2022;

j) Huntington Hospital, Provider No. 05-0438 for the fiscal year ending December 31, 2020;

k) Mayo Clinic Arizona d/b/a Mayo Clinic Hospital ("Mayo Clinic Arizona"), Provider No. 03-0103 for the fiscal year ending December 31, 2018;

l) Metropolitan Hospital d/b/a University of Michigan Health – West ("Metropolitan Hospital"), Provider No. 23-0236 for the fiscal year ending June 30, 2020;

m) Milton S. Hershey Medical Center d/b/a Penn State Health Milton S. Hershey Medical Center ("Hershey Medical Center"), Provider No. 39-0256 for the fiscal year ending June 30, 2023;

n) Naples Community Hospital, Provider No. 10-0018 for the fiscal year ending September 30, 2020;

o) Oakwood Healthcare, Inc. d/b/a Beaumont Health – Dearborn ("Beaumont Health – Dearborn"), Provider No. 23-0020 for the fiscal year ending December 31, 2021;

p) Palmetto Richland d/b/a Prisma Health Richland Hospital ("Prisma Richland"), Provider No. 42-0018 for the fiscal years ending September 30, 2017, and September 30, 2018;

q) Shands Jacksonville Medical Center, Inc. d/b/a UF Health Jacksonville ("UF Health Jacksonville"), Provider No. 10-0001 for the fiscal year ending June 30, 2020;

r) Shands Teaching Hospital and Clinics, Inc. d/b/a UF Health Shands Florida, UF Health Shands ("UF Health Shands"), Provider No. 10-0113 for the fiscal year ending June 30, 2020;

s) Spartanburg Medical Center, Provider No. 42-0007 for the fiscal year ending September 30, 2020;

t) Spectrum Health Hospitals d/b/a Spectrum Health Butterworth Campus ("Spectrum Health Butterworth"), Provider No. 23-0038 for the fiscal year ending December 31, 2020;

u) St. John Medical Center d/b/a UH St. John Medical Center ("St. John Medical Center"), Provider No. 36-0123 for the fiscal year ending December 31, 2022;

v) St. Joseph Regional Health Network d/b/a St. Joseph Medical Center ("St. Joseph Medical Center"), Provider No. 39-0096 for the fiscal year ending June 30, 2023;

w) St. Vincent's Medical Center, Provider No. 07-0028 for the fiscal year ending September 30, 2022;

x) The Hospital of Central Connecticut d/b/a Hospital of Central Connecticut ("Hospital of Central Connecticut"), Provider No. 07-0035 for the fiscal year ending September 30, 2022;

y) The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health, The Moses H. Cone Memorial Hospital ("Cone Health"), Provider No. 34-0091 for the fiscal years ending September 30, 2018, and September 30, 2022;

z) The William W. Backus Hospital d/b/a William W. Backus Hospital, Backus Hospital ("Backus Hospital"), Provider No. 07-0024 for the fiscal year ending September 30, 2022;

aa) UH Cleveland Medical Center d/b/a UH Case Medical Center ("UH Cleveland Medical Center"), Provider No. 36-0137 for the fiscal year ending December 31, 2022;

bb) UH Geauga Medical Center, Provider No. 36-0192 for the fiscal year ending January 31, 2022;

cc) UH Regional Hospitals d/b/a UH Richmond Medical Center ("UH Richmond Medical Center"), Provider No. 36-0075 for the fiscal year ending December 31, 2022;

dd) William Beaumont Hospital d/b/a Beaumont Health – Royal Oak ("Beaumont Health – Royal Oak"), Provider No. 23-0130 for the fiscal year ending December 31, 2021; and,

ee) William Beaumont Hospital d/b/a Beaumont Health – Troy ("Beaumont Health – Troy"), Provider No. 23-0269 for the fiscal year ending December 31, 2021.

12. Defendant Robert F. Kennedy, Jr., is the Secretary of the Department of Health and Human Services and is the federal officer responsible for administering the Medicare program pursuant to the Social Security Act. Defendant is sued in his official capacity. References to "Defendant" or "Secretary" herein are meant to refer to him, his subordinates, his official predecessors or successors, and the Department and its components that he oversees, as the context requires.

**LEGAL BACKGROUND**

### I.    The Medicare Program Generally

13.    Medicare is a public health insurance program that furnishes health benefits to the aged and disabled.  42 U.S.C. § 1395c.  The Secretary has delegated much of the responsibility for administering the Medicare program to the Centers for Medicare and Medicaid Services ("CMS"), which is a component of the Department of Health and Human Services.

14.    The Medicare statute requires the Secretary to prospectively pay hospitals for inpatient operating and capital related costs, as set forth respectively at 42 U.S.C. § 1395ww(d) and 42 U.S.C. § 1395ww(g).

### II.    Medicare Prospective Payments for Operating Costs – Subsection (d)

15.    When Medicare was first enacted, hospitals were reimbursed on a cost basis.  42 U.S.C. § 1395x(v)(1)(A).  Over time, however, it was recognized that costs could be better contained if hospitals were paid for their costs prospectively, rather than the hospital's retrospective calculation of their reasonable costs for the year.  Thus, Congress, through a series of legislative changes, phased in a prospective payment system for hospital inpatient costs.  Congress first required the Medicare program to implement a prospective payment system for operating costs in 1983.  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(1).

16.    The Medicare statute provides for the prospective payment of hospital *operating* costs in subsection (d) of 42 U.S.C. § 1395ww.  Payment is based on a predetermined rate for patient discharges set according to expected costs associated with patients' diagnoses.  42 U.S.C. § 1395ww(b)(2).

17.    Each type of diagnosis falls within a diagnosis related group that is associated with

a specific weighting. 42 U.S.C. § 1395ww(d)(4). The weighting is multiplied by a "standardized amount" to result in the payment for that particular admission. 42 U.S.C. § 1395ww(d)(3)(A). The standardized amount is in turn comprised of two components: (a) a labor-related portion; and (b) a non-labor-related portion. 42 U.S.C. § 1395ww(d)(3)(E). The labor-related portion is multiplied by a labor factor, called the "wage index," which varies based on the geographic area where the hospital is situated. *Id.*

18. For purposes of the wage index, each hospital is assigned to a given urban or rural area. The Secretary has assigned a wage index value to each wage area that reflects the hospital wage levels of that area relative to all geographic areas. 42 C.F.R. § 412.64(h). The Secretary has defined an "urban area" as a "Metropolitan Statistical Area [("MSA")] or a metropolitan division (in the case where a Metropolitan Statistical Area is divided into Metropolitan Divisions), as defined by the Executive Office of Management and Budget" and a "rural area" as "an area outside an urban area." 42 C.F.R. §§ 412.64(b)(1)(ii)(A), (C). Each state has multiple "urban areas," and most have one "rural area." 42 U.S.C. § 1395ww(d)(2)(D) (defining "urban" and "rural" for purposes of the inpatient payment); 42 C.F.R. § 412.64(b).

19. Besides the costs associated with labor and the severity of a patient's diagnosis, Congress also recognized several other factors that could increase a hospital's operating costs. Congress therefore implemented payment adjustments to account for these costs, including DSH adjustments to aid safety net hospitals, Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(5)(D), as well as an indirect medical education adjustment for teaching hospitals, Social Security Amendments of 1983, Pub. L. No. 98-21, § 601; 42 U.S.C. § 1395ww(d)(5)(B)). Initially, capital costs remained paid on a reasonable cost basis. 56 Fed. Reg. 43358, 43358 (Aug. 30, 1991) (noting that prior to 1991, "hospital inpatient operating costs

were the only costs covered under the prospective payment system").

### III.   Reclassifications

20.   Following the implementation of the inpatient prospective payment system, Congress determined that some hospitals needed a mechanism by which to petition the Secretary for modifications to the portion of their reimbursement associated with their physical location. Some hospitals' cost structures resembled the cost structures of hospitals in neighboring areas more than the cost structures of hospitals within their own area, meaning that payment equity required an exceptions process.

21.   Congress therefore allowed, as of 1991, hospitals to "reclassify" to a neighboring geographic area, such that they can obtain that area's wage index, which would have expenses more commensurate with the reclassifying hospital's expenses.  Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6003(h)(1); 42 U.S.C. § 1395ww(d)(10).

22.   Initially, the Secretary allowed two different forms of reclassifications.  The standardized amount at the time differed depending upon whether a hospital was in a rural area or an urban area.  42 U.S.C. § 1395ww(d)(3)(A)(ii).

23.   Accordingly, the Secretary created one pathway to allow rural hospitals to reclassify as urban for purposes of obtaining the urban standardized amount.  55 Fed. Reg. 36754, 36755 (Sept. 6, 1990).  This required a showing of the hospital's high total costs per discharge.  42 C.F.R. § 412.230(d)(1) (1991).

24.   The second type of reclassification allowed a hospital to obtain the wage index of a neighboring area.  55 Fed. Reg. at 36755.  Qualification for this reclassification required only a showing of high wage costs for the applicant hospital.  42 C.F.R. § 412.230(e)(i) (1991).

25.   The urban and rural standardized rates were equalized under the Medicare

Prescription Drug, Improvement and Modernization Act of 2003; Pub. L. No. 108-173, § 401. Accordingly, the Secretary removed the standardized amount reclassification provisions. 69 Fed. Reg. 48915, 49103 (Aug. 11, 2004); *compare* 42 C.F.R. §§ 412.230(a)(1)(i) *with* (a)(1)(ii) (pre- and post-2005 reclassification purposes). Only wage index reclassifications remain.

## IV.    Medicare Prospective Payments for Operating Costs – Subsection (g)

26.    Once the operating expense prospective payment was completed, Congress then required that the Medicare program develop a prospective payment system for capital-related costs of inpatient hospital services, effective as of October 1, 1991. Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203 § 4006(b)(1); 42 U.S.C. § 1395ww(g).

27.    The Secretary was required specifically to pay on a "per discharge basis" based on a "weighting" appropriate for "the classification of [each such] discharge." 42 U.S.C. § 1395ww(g)(1)(B)(i); *see also* H.R. Rep. No. 100-495 at 534 (1987) (describing Congress's directive to establish a capital-related cost prospective payment system).

28.    In other words, capital costs would now be determined prospectively based on the anticipated cost per discharge, rather than retrospectively at the end of a cost reporting year.

29.    While they may appear similar, the operating cost prospective payment system and the capital cost prospective payment system are separate. These prospective payment systems are covered by separate statutory provisions—42 U.S.C. § 1395ww(d) and § 1395ww(g), respectively. Importantly, 42 U.S.C. § 1395ww(g) (related to capital costs) does not cross-reference 42 U.S.C. § 1395ww(d) (related to operating costs).

30.    The capital prospective payment system provision includes two permissive adjustments and one exception process, each of which reflects cases where cost anomalies may need to be addressed by the Secretary.

14

31.    The first adjustment permits the Secretary to take into account variations in the relative costs of capital and construction for the different types of facilities or areas in which they are located (variations in local cost).  42 U.S.C. § 1395ww(g)(1)(B)(ii).

32.    The second adjustment permits the Secretary to take into account variations in hospital occupancy rate.  42 U.S.C. § 1395ww(g)(1)(B)(iv).

33.    The exception process permits the Secretary to grant exceptions, including appropriate exceptions to reflect existing capital obligations.  42 U.S.C. § 1395ww(g)(1)(B)(iii).

34.    The Secretary implemented this statute in regulation.  The key features of the regulatory scheme were all supported by cost analyses.

35.    The Secretary initially concluded that there was "wide variation in capital costs per case" experienced by various hospitals.  56 Fed. Reg. at 43363.

36.    Consequently, the Secretary conducted a comprehensive regression analysis to evaluate the relationship between historic capital costs and certain types of hospital groups.  *Id*. at 43369–82.

37.    The Secretary's cost analysis focused on several specific circumstances including:

- Teaching hospitals;
- Hospitals with a higher number of low-income patients;
- Hospitals in an urban setting;
- Hospitals in a large urban setting; and
- Hospitals in a rural setting.

*Id.*

38.    Having concluded that some of these characteristics were predictive of capital costs, the Secretary created certain capital cost payment adjustments that mirrored certain parallel

15

operating cost adjustments. *Id.* at 43369–70 (noting that the Secretary has "latitude to develop adjustments based on combined costs for the capital prospective payment system."). Specifically, the Secretary created an indirect teaching adjustment for teaching hospitals and a DSH adjustment for safety net hospitals. *Id.* at 43452–53.

39.    The regulation and initial rulemaking also address all of the instances of the Secretary's discretionary authority to make modifications to its general rule.

40.    The Secretary properly understood that each such exception needed to be interpreted in terms of reflecting a modification that would be narrowly tailored to specific cost anomalies. As a result, the Secretary opted to create:

- Adjustments for local cost variations through the geographic adjustment factor. 42 C.F.R. § 412.316 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(ii) to take into account the relative costs of capital and construction in various geographic marketplaces); 56 Fed. Reg. at 43374; and

- Exception payments for hospitals meeting certain specified criteria. 42 C.F.R. § 412.348 (reflecting the permissive authority of 42 U.S.C. § 1395ww(g)(1)(B)(iii) to grant exceptions in cases determined appropriate by the Secretary).

41.    Although the Secretary recognized his discretionary ability to create an adjustment for hospital occupancy levels, he determined that such an adjustment did not bear a sufficient relationship to costs and therefore declined to create such an adjustment. *Id.* at 43411–12.

42.    These regulations demonstrate that the Secretary has already considered, and engaged in explicit rulemaking about, the additional criteria for which he has discretion under § 1395ww(g). There are no other authorities that provide for any adjustments in the Secretary's sole discretion except those arising from cost considerations.

16

## V.        The Capital DSH Adjustment

43.        As previously stated, one of the hospital categories whose cost data merited special treatment are safety net hospitals.  For these hospitals, the Secretary created the capital DSH payment adjustment.  42 C.F.R. § 412.320(b)(1); *see also* 56 Fed. Reg. at 43377–79.

44.        The Secretary performed a regression analysis to determine the proper amount to pay these hospitals to compensate them for their capital costs through the DSH payment mechanism.  56 Fed. Reg. at 43369–82.

45.        Notably, this regression analysis indicated that safety net hospitals in rural areas did not incur higher capital costs, and therefore the Secretary determined not to make higher payments to them.  *Id*. at 43377.  Thus, only urban DSH hospitals could receive the adjustment.  Unlike now, all rural hospitals were hospitals physically located in the rural area at the time this regulation was promulgated.

46.        The initial capital cost prospective payment rulemaking also addressed how to treat hospitals that have undergone a geographic reclassification for operating cost prospective payment system purposes.  The Secretary distinguished between the two types of reclassifications noted above (i.e., "standardized amount" reclassifications and "wage index" reclassifications) and their impact on capital DSH as follows:

> Any hospital that is reclassified to an urban area by the [Medicare Geographic Classification Review Board ("MGCRB")] for purposes of its standardized amount is considered to be urban for all prospective payment purposes other than the wage index.  As such, if any hospital reclassified by the MGCRB to an urban area for purposes of the standardized amount has at least 100 beds, it would be eligible for capital disproportionate share payments.  We note that a rural hospital reclassified for purposes of the wage index only is still considered a rural hospital, and as such, will not be eligible for capital disproportionate share payments.

*Id.* at 43379.

47.        As previously discussed, the "standardized amount" reclassifications required a

more comprehensive demonstration of higher total costs, as compared with the more limited wage data necessary to qualify for a "wage index" reclassification.

48.     Therefore, the Secretary allowed only the standardized amount reclassification to result in a higher capital DSH payment.  The latter, with only high wage costs presented, would not generally have been able to show that their costs were comparable to urban hospitals, and therefore capital DSH payment would not be warranted.  Thus, as with every other consideration of geographic adjustments to the capital cost prospective payment system, the cost element generated the policy decision.  Such consideration tracks the governing statute, 42 U.S.C. § 1395ww(g)(1)(B)(ii), which allows the Secretary to make "adjustment[s] to take into account variations in the relative costs of capital . . . for the different types of facilities."

## VI.     Rural Reclassification

49.     Separately, in 1999, Congress created a pathway for hospitals to assume "rural" status for purposes of the operating prospective payment system.  Medicare, Medicaid and SCHIP Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, § 401 (1999); 42 U.S.C. § 1395ww(d)(8)(E).

50.     To qualify for rural status, all a hospital need show is that it could otherwise have qualified as a rural referral center ("RRC") or a sole community hospital ("SCH") but for its location in an urban area.  42 U.S.C. § 1395ww(d)(8)(E)(ii)(III).

51.     The manifest intent of the statute was to allow hospitals that were close to meeting the requirements of RRC or SCH status, but for their location in an urban area, to be able to overcome that last requirement by making the election to become rural.  Indeed, in the Secretary's Federal Register preamble implementing this statute, it specifically laid out the two-step approach towards obtaining RRC or SCH status for an urban hospital following this pathway.  65 Fed. Reg.

18

47026, 47030–31 (Aug. 1, 2000).

52.     Generally speaking, it is not desirable to be a "rural" hospital because some portion of the prospective payment is based on the hospital's wage index, which is based on the costs of labor in the hospital's geographic area.  42 C.F.R. § 412.64(h) (operating payment); 42 C.F.R. § 412.316 (capital payment).  Geographically rural hospitals generally have lower costs of labor, meaning that their wage indexes are lower than urban areas.

53.     However, SCHs are entitled to favorable reimbursement status.  42 C.F.R. § 412.92(d).  Previously, RRCs had favorable reimbursement status as well.  42 C.F.R. § 412.96(e) (for discharges prior to FY 1995, RRCs were paid at an urban, instead of rural, rate for their standardized amount).  RRCs and SCHs also continue to have favorable status for reclassification purposes, which allows them to waive certain proximity and wage index requirements.  42 C.F.R. §§ 412.230(a)(3) & (d)(3).

54.     Becoming an "acquired" rural status hospital under this pathway has no connection to either: (a) the hospital's actual geographic location; or (b) the hospital's cost structure.

55.     There are, for instance, hospitals in New York City that have "acquired" rural status.  *See* 84 Fed. Reg. 42044, 42679 (Aug. 16, 2019) (referencing the FY 2020 Proposed Rule Impact File, available on the CMS.gov website at the "FY2020 IPPS Final Rule Home Page").  From a cost structure, it is clear that their costs are like (if not significantly in excess of) any other urban hospital's cost.

56.     A typical physically located rural hospital in New York State would be located outside an MSA and in a rural area of the state, serving a county with a relatively small population and having a bed count under 100.  Yet both it and reclassified hospitals in New York City are deemed "rural" for certain operating cost prospective payment purposes.  The term "rural" is

19

therefore simply a categorization of a type of hospital, and not any indication of whether the hospital's cost structure is like a hospital that is truly "rural" as a layperson would understand that term.

## VII.    The Secretary's 2006 Capital DSH Rule

57.    Although initially the Secretary properly understood that the purpose of the capital prospective payment was to determine prospectively a hospital's expected per-discharge capital costs and pay accordingly, the Secretary subsequently veered away from the statute's dictates.

58.    In 2006, the Secretary promulgated the regulation at issue here, 42 C.F.R. § 412.320(a)(1)(iii), which sets forth that "for an urban hospital that is reclassified as rural as set forth in § 412.103, the geographic classification is rural," which results in barring the hospital from receiving the capital DSH adjustment.

59.    The Secretary claims in the implementing Federal Register notice that his rationale for this policy is as follows:

> These changes were proposed to reflect our historic policy that hospitals reclassified as rural under § 412.103 also are considered rural under the capital PPS [prospective payment system]. Since the genesis of the capital PPS in FY 1992, the same geographic classifications used under the operating PPS also have been used under the capital PPS.

71 Fed. Reg. 47870, 48104 (Aug. 18, 2006). The Secretary's statements, however, lack any grounding in actual fact.

60.    The only instances in which the Secretary addressed capital DSH and geographic locations were in 1991 and 2004. In 1991, the Secretary actually distinguished between reclassifications for standardized amount and those for wage index. Only the former were accepted for determining an adjustment to capital cost prospective payments. 56 Fed. Reg. at 43379. To achieve a standardized amount reclassification required a showing of higher total costs, as

20

compared with the other hospitals in the reclassifying hospital's geographic area.  42 C.F.R. § 412.230(d).

61.    Moreover, in 2004, the Secretary stated that he would no longer take into account *any* hospital reclassifications for receipt of certain special capital payments.  At that time, the Secretary stated that a hospital must be physically located in an urban, or large urban, area to obtain the capital cost payment benefits associated with those areas.  69 Fed. Reg. at 49187 (promulgating a revised regulation at 42 C.F.R. § 412.320(a)).

62.    As to whether it had actually been the Secretary's policy to treat hospitals as rural when they have "acquired" rural status under 42 C.F.R. § 412.103, there is no public reference to that policy prior to 2006.  And even if it had been the Secretary's policy, it had not been longstanding, given that "acquired" rural status was not even available to hospitals until 2001.

63.    In any event, the Secretary has *never* produced any cost analysis that showed that the capital cost structure of "acquired" rural status hospitals is similar to other hospitals physically located in the rural area.  Nor could it, since, in fact, these hospitals are urban hospitals and obtaining rural status does not change a hospital's costs.

64.    The Secretary's policy also conflicts with his policy statements articulated just the year before.  As noted above, one of the payment adjustments created by Congress as part of the operating cost payment system relates to payments for the indirect costs of graduate medical education.

65.    Congress also created a separate payment adjustment for direct graduate medical education, which is codified at 42 U.S.C. § 1395ww(h).

66.    Rural status under that statute has certain favorable aspects, specifically relating to the number of full-time equivalent residents ("FTEs") which are reimbursable to the hospital.  42

21

U.S.C. § 1395ww(h)(4)(F)(i) (the limit on reimbursable FTEs is often referred to as the "FTE cap").

67.    The Secretary addressed the *inapplicability* of "acquired" rural status to direct graduate medical education ("GME") by stating:

> A hospital's reclassification as located in a rural area under this provision affects only payments under section 1886(d) of the Act [found at 42 U.S.C. § 1395ww(d)]. Accordingly, a hospital that is treated as rural under this provision can receive the FTE cap adjustments that any other rural hospital receives, but only to the FTE cap that applies for purposes of [indirect medical education ("IME")] payments, which are made under section 1886(d) of the Act. The hospital could not receive adjustments to its direct GME FTE cap because payments for direct GME are made under section 1886(h) of the Act and the section 1886(d)(8)(E) reclassifications affect only the payments that are made under that section 1886(d) of the Act. Therefore, a hospital that reclassifies as rural under section 1886(d)(8)(E) of the Act may receive the 130-percent adjustment to its IME FTE cap and its IME FTE cap may be adjusted for any new programs, similar to hospitals that are actually located in a rural location.

70 Fed. Reg. 47278, 47437 (Aug. 12, 2005) (emphasis added).

68.    The Secretary demonstrated a similar understanding of the separateness of the operating and capital payment system in his 2007 rulemaking. In that rulemaking, the Secretary reiterated his belief that he has "broad authority" to establish and implement the capital cost payment system. 72 Fed. Reg. 47130, 47392 (Aug. 22, 2007). He also acknowledged that Congress set forth "broad governing principles" for this payment system, and that any modifications to this payment system must remain "within those principles." *Id*. at 47398. Chief among such principles is that the capital cost payment system must ensure that "standard payment rates . . . reflect the costs that an average, efficient provider would bear to provide the services required for quality patient care." *Id*. at 47394.

69.    On that basis, the Secretary determined that the margins between payment and capital cost had increased, and therefore he chose to recalibrate payment to better reflect actual

costs, including the removal of certain adjustments altogether.  *Id.* at 47395–96.

70.    Of particular relevance here, the Secretary rebuffed requests from some hospitals seeking that the Secretary look at total operating and capital costs together when determining hospitals' margins.

71.    The Secretary stated that "we believe that it is appropriate under the current design of the capital and operating IPPSs [inpatient prospective payment systems] to base proposals for payment policies under the capital IPPS on analysis that is confined to the data regarding the capital IPPS alone."  *Id.* at 47399.  In other words, the Secretary again reiterated that operating cost payment policies and cost data should only affect the operating prospective payment system, and the capital prospective payment system should reflect capital cost data standing alone.

## VIII.   Impact of Dual Reclassifications

72.    In 2016, the Secretary changed his rules regarding which hospitals could undergo an MGCRB reclassification. 81 Fed. Reg. 23428, 23433–34 (April 21, 2016).

73.    Previously, the Secretary had stated that "acquired" rural status hospitals could not undergo an MGCRB reclassification.  The Secretary justified this rule on the policy reason that hospitals asserting that urban status puts them at a disadvantage should not be able to then claim that the disadvantages of rural status entitle them to reclassify.  65 Fed. Reg. at 47088.

74.    The Secretary then lost two cases in the Second Circuit and Third Circuit where the courts, in analyzing the phrase "for purposes of this subsection" within 42 U.S.C. § 1395ww(d)(8)(E), held that this phrase has a plain and explicit meaning.  *Geisinger Cmty. Med. Ctr. v. Sec'y, U.S. Dep't of Health and Human Servs.*, 794 F.3d 383 (3d Cir. 2015); *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257 (2nd Cir. 2016).  Since § 1395ww(d)(10) (pertaining to reclassifications) is in § 1395ww(d), then an "acquired" rural status hospital can use that status for

23

other purposes within § 1395ww(d). In other words, these Courts did not allow the Secretary to use his policy considerations to supersede the plain meaning of the applicable statute.

75. The Secretary ultimately relented and acquiesced in those holdings by finally allowing hospitals to undergo dual reclassifications. 81 Fed. Reg. at 23433–34.

## IX.    Medicare Cost Report Appeals

76. At the close of a hospital's fiscal year, it is required to submit to its designated Medicare Administrative Contractor ("MAC") a "cost report" showing both the costs incurred by the hospital during the fiscal year and the appropriate share of these costs to be apportioned to Medicare. 42 C.F.R. § 413.24(f) (2018). MACs are private companies under contract with the Secretary to pay Medicare claims and audit hospital cost reports, among other duties. 42 U.S.C. § 1395kk-1.

77. The MAC must analyze and audit the cost report and inform the hospital of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803(a). The capital DSH adjustment is among the components of the final payment determination reported in the NPR.

78. A hospital that is dissatisfied with the MAC's final determination or that did not receive a timely MAC final determination has a statutory right to a hearing before the Board. 42 U.S.C. § 1395oo(a).

79. The Board has jurisdiction over such appeals if the following three requirements are met: (1) the hospital is dissatisfied with the final MAC determination or has not received a final determination from the MAC on a timely basis; (2) the amount in controversy is at least $10,000; and (3) the hospital requests a hearing within 180 days of receiving the final determination or within 180 days after such determination would have been received if it had been

24

timely made.  *Id.*

80.    A group of hospitals may appeal a common dispute to the Board if the following requirements are met: (1) the hospitals are dissatisfied with the final MAC determinations or have not received final determinations from the MAC on a timely basis; (2) the amount in controversy is, in the aggregate, at least $50,000; and (3) the hospitals request a hearing within 180 days of the Secretary's determinations or within 180 days after such determinations would have been received if they had been timely made.  42 U.S.C. § 1395oo(a)–(b).

81.    In addition, for group appeals, the matter at issue must involve "a single question of fact or interpretation of law, regulations, or CMS Ruling that is common to each provider in the group."  42 C.F.R. § 405.1837(a)(2).  The Board lacks the authority to decide the validity of a Medicare regulation.  42 C.F.R. § 405.1867.  If a hospital (or group of hospitals) appeals an issue that involves a question that is beyond the Board's authority, the Board may authorize EJR of the case.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

82.    The Board must grant EJR if it determines that (1) the Board does not have the authority to decide the legal question because the question is a challenge either to the constitutionality of a statute or to the substantive or procedural validity of a regulation or CMS Ruling; and (2) the Board has jurisdiction to hold a hearing on the specific matter at issue.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842(f)(1).

83.    If the Board issues an EJR decision, the CMS Administrator has the right to "review the Board's jurisdictional finding, but not the Board's authority determination."  42 C.F.R. § 405.1842(a)(3).  The Board's decision to grant EJR "becomes final and binding on the parties unless the decision is reversed, affirmed, modified, or remanded by the Administrator."  42 C.F.R. § 405.1842(g)(1)(iii).  A final Board decision constitutes the final agency action of the Secretary.

42 C.F.R. § 405.1877(a)(2).

84.    If the Board grants a hospital's request for EJR, the hospital may seek judicial review of the action involving a question of law or regulations by commencing a civil action within sixty days of the date on which notification of the Board's EJR determination is received.  42 U.S.C. § 1395oo(f)(l); 42 C.F.R. § 405.1842(g)(2).

85.    Under the Administrative Procedure Act ("APA"), a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

X.    The Secretary's "Substantive Claim" Requirement

86.    The regulation at 42 C.F.R. § 413.24(j)(1) requires that a provider include a claim on its cost report by either "[c]laiming full reimbursement in the provider's cost report for the specific item in accordance with Medicare policy, if the provider seeks payment for the item that it believes comports with program policy" or "[s]elf-disallowing the specific item in the provider's cost report, if the provider seeks payment that it believes may not be allowable or may not comport with Medicare policy."  These provisions apply to cost reporting periods beginning on or after January 1, 2016.  The regulation at 42 C.F.R. § 405.1873 goes on to establish procedures the Board must follow to determine a provider's compliance with § 413.24(j).  Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs, 80 Fed. Reg. 70298, 70551–65, 70603–04 (Nov. 13, 2015).

87.    Pursuant to rules established by the Board, when the "final schedule of providers for a group appeal is filed concurrently with an EJR request," the MAC has "five (5) business days

26

to either" file a substantive claim challenge or "[s]ubmit a filing . . . certif[ying] that it will, *in fact*, be filing a challenge(s) . . . .[emphasis in original]." Board Rule 20 also instructs that if all required jurisdictional documents have been filed in the Board's electronic filing system, a provider should file a letter, known as a Rule 20 letter, so certifying to the Board instead of filing a final schedule of providers. If the MAC files the certification, it must "file the challenge(s) no later than 20 days following the filing of the EJR request." PRRB Rule 44.6 (https://www.cms.gov/files/document/current-prrb-rules-v-32-board-order-no-4-december-15-2023.pdf). Thus, if a provider files a Rule 20 letter or a final schedule of provider concurrently with a EJR request, the MAC has five business days to file a substantive claim challenge or "[s]ubmit a filing…certif[ying] that it will, *in fact*, be filing a [substantive claim] challenge" and then the MAC has 20 days to file the substantive claim challenge  *Id.*

88.      The statute governing the Board empowers it to decide a provider's dissatisfaction with "the amount of total program reimbursement due the provider." 42 U.S.C. § 1395oo(a)(1)(A)(i). Nowhere in that statute is there a requirement that a provider must include a claim for a specific cost on its cost report before payment related to that cost can be addressed by the Board.

## FACTS SPECIFIC TO THIS CASE

89.      All of the Plaintiffs in this case are hospitals that participated in the Medicare program during the appealed period.

90.      As set forth with more particularity below, each Plaintiff hospital was a safety net hospital physically located in an MSA, and thus in an urban area, during the appealed period. Prior to that period, each hospital underwent a rural reclassification and was therefore considered to be rural as of that date and did not receive any capital DSH payment for the period under appeal.

27

**I.        Alamance Regional Medical Center**

91.        Alamance Regional Medical Center was a safety net hospital physically located in Burlington, North Carolina during the period under appeal.

92.        Burlington was located within the Burlington, NC MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

93.        Thus, Alamance Regional Medical Center was physically located in an urban area during the period under appeal.

94.        Alamance Regional Medical Center underwent a rural reclassification with an effective date of September 30, 2021, by application to CMS.  Therefore, although it remained physically in the Burlington, NC MSA, it was considered to be in the rural area of North Carolina as of that date.

95.        Alamance Regional Medical Center did not receive a capital DSH payment for the period under appeal.

**II.       Beaumont Health – Farmington Hills**

96.        Beaumont Health – Farmington Hills was a safety net hospital physically located in Farmington Hills, Michigan during the period under appeal.

97.        Farmington Hills was located within the Detroit-Warren-Dearborn, MI MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

98.        Thus, Beaumont Health – Farmington Hills was physically located in an urban area during the period under appeal.

99.        Beaumont Health – Farmington Hills underwent a rural reclassification with an effective date of December 28, 2017, by application to CMS.  Therefore, although it remained physically in the Detroit-Warren-Dearborn, MI MSA, it was considered to be in the rural area of

Michigan as of that date.

100.    Beaumont Health – Farmington Hills did not receive a capital DSH payment for the period under appeal.

### III.    Flagler Hospital

101.    Flagler Hospital was a safety net hospital physically located in Saint Augustine, Florida during the periods under appeal.

102.    Saint Augustine was located within the Jacksonville, FL MSA and thus in an "urban area" for Medicare payment purposes during the periods under appeal.

103.    Thus, Flagler Hospital was physically located in an urban area during the periods under appeal.

104.    Flagler Hospital underwent a rural reclassification with an effective date of April 28, 2009, by application to CMS.  Therefore, although it remained physically in the Jacksonville, FL MSA, it was considered to be in the rural area of Florida as of that date.

105.    Flagler Hospital did not receive a capital DSH payment for the periods under appeal.

### IV.    Tampa General Hospital

106.    Tampa General Hospital was a safety net hospital physically located in Tampa, Florida during the period under appeal.

107.    Tampa was located within the Tampa-St. Petersburg-Clearwater, FL MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

108.    Thus, Tampa General Hospital was physically located in an urban area during the period under appeal.

109.    Tampa General Hospital underwent a rural reclassification with an effective date

of August 30, 2019, by application to CMS. Therefore, although it remained physically in the Tampa-St. Petersburg-Clearwater, FL MSA, it was considered to be in the rural area of Florida as of that date.

110.    Tampa General Hospital did not receive a capital DSH payment for the period under appeal.

### V.    Hartford Hospital

111.    Hartford Hospital was a safety net hospital physically located in Hartford, Connecticut during the period under appeal.

112.    Hartford was located within the Hartford-East Hartford-Middletown, CT MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

113.    Thus, Hartford Hospital was physically located in an urban area during the period under appeal.

114.    Hartford Hospital underwent a rural reclassification with an effective date of May 21, 2018, by application to CMS. Therefore, although it remained physically in the Hartford-East Hartford-Middletown, CT MSA, it was considered to be in the rural area of Connecticut as of that date.

115.    Hartford Hospital did not receive a capital DSH payment for the period under appeal.

### VI.    Deer Valley Medical Center

116.    Deer Valley Medical Center was a safety net hospital physically located in Phoenix, Arizona during the period under appeal.

117.    Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

30

118.    Thus, Deer Valley Medical Center was physically located in an urban area during the period under appeal.

119.    Deer Valley Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS.  Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

120.    Deer Valley Medical Center did not receive a capital DSH payment for the period under appeal.

### VII.    Lincoln Medical Center

121.    Lincoln Medical Center was a safety net hospital physically located in Phoenix, Arizona during the period under appeal.

122.    Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

123.    Thus, Lincoln Medical Center was physically located in an urban area during the period under appeal.

124.    Lincoln Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS.  Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

125.    Lincoln Medical Center did not receive a capital DSH payment for the period under appeal.

### VIII.    Osborn Medical Center

126.    Osborn Medical Center was a safety net hospital physically located in Scottsdale,

Arizona during the period under appeal.

127. Scottsdale was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

128. Thus, Osborn Medical Center was physically located in an urban area during the period under appeal.

129. Osborn Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS. Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

130. Osborn Medical Center did not receive a capital DSH payment for the period under appeal.

### IX.    Shea Medical Center

131. Shea Medical Center was a safety net hospital physically located in Scottsdale, Arizona during the period under appeal.

132. Scottsdale was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

133. Thus, Shea Medical Center was physically located in an urban area during the period under appeal.

134. Shea Medical Center underwent a rural reclassification with an effective date of January 1, 2017, by application to CMS. Therefore, although it remained physically in the Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

135. Shea Medical Center did not receive a capital DSH payment for the period under

appeal.

### X.     Huntington Hospital

136.     Huntington Hospital was a safety net hospital physically located in Pasadena, California during the period under appeal.

137.     Pasadena was located within the Los Angeles-Long Beach-Anaheim, CA MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

138.     Thus, Huntington Hospital was physically located in an urban area during the period under appeal.

139.     Huntington Hospital underwent a rural reclassification with an effective date of August 22, 2017, by application to CMS.  Therefore, although it remained physically in the Los Angeles-Long Beach-Anaheim, CA MSA, it was considered to be in the rural area of California as of that date.

140.     Huntington Hospital did not receive a capital DSH payment for the period under appeal.

### XI.     Mayo Clinic Arizona

141.     Mayo Clinic Arizona was a safety net hospital physically located in Phoenix, Arizona during the period under appeal.

142.     Phoenix was located within the Phoenix-Mesa-Chandler, AZ MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

143.     Thus, Mayo Clinic Arizona was physically located in an urban area during the period under appeal.

144.     Mayo Clinic Arizona underwent a rural reclassification with an effective date of December 27, 2016, by application to CMS.  Therefore, although it remained physically in the

Phoenix-Mesa-Chandler, AZ MSA, it was considered to be in the rural area of Arizona as of that date.

145.    Mayo Clinic Arizona did not receive a capital DSH payment for the period under appeal.

### XII.    Metropolitan Hospital

146.    Metropolitan Hospital was a safety net hospital physically located in Wyoming, Michigan during the period under appeal.

147.    Wyoming was located within the Grand Rapids-Kentwood, MI MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

148.    Thus, Metropolitan Hospital was physically located in an urban area during the period under appeal.

149.    Metropolitan Hospital underwent a rural reclassification with an effective date of April 25, 2018, by application to CMS.  Therefore, although it remained physically in the Grand Rapids-Kentwood, MI MSA, it was considered to be in the rural area of Michigan as of that date.

150.    Metropolitan Hospital did not receive a capital DSH payment for the period under appeal.

### XIII.    Hershey Medical Center

151.    Hershey Medical Center was a safety net hospital physically located in Hershey, Pennsylvania during the period under appeal.

152.    Hershey was located within the Harrisburg-Carlisle, PA MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

153.    Thus, Hershey Medical Center was physically located in an urban area during the period under appeal.

154. Hershey Medical Center underwent a rural reclassification with an effective date of April 4, 2017, by application to CMS. Therefore, although it remained physically in the Harrisburg-Carlisle, PA MSA, it was considered to be in the rural area of Pennsylvania as of that date.

155. Hershey Medical Center did not receive a capital DSH payment for the period under appeal.

### XIV. Naples Community Hospital

156. Naples Community Hospital was a safety net hospital physically located in Naples, Florida during the period under appeal.

157. Naples was located within the Naples-Marco Island, FL MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

158. Thus, Naples Community Hospital was physically located in an urban area during the period under appeal.

159. Naples Community Hospital underwent a rural reclassification with an effective date of September 5, 2018, by application to CMS. Therefore, although it remained physically in the Naples-Marco Island, FL MSA, it was considered to be in the rural area of Florida as of that date.

160. Naples Community Hospital did not receive a capital DSH payment for the period under appeal.

### XV. Beaumont Health - Dearborn

161. Beaumont Health - Dearborn was a safety net hospital physically located in Dearborn, Michigan during the period under appeal.

162. Dearborn was located within the Detroit-Warren-Dearborn, MI MSA and thus in

an "urban area" for Medicare payment purposes during the period under appeal.

163.    Thus, Beaumont Health - Dearborn was physically located in an urban area during the period under appeal.

164.    Beaumont Health - Dearborn underwent a rural reclassification with an effective date of November 23, 2016, by application to CMS.  Therefore, although it remained physically in the Detroit-Warren-Dearborn, MI MSA, it was considered to be in the rural area of Michigan as of that date.

165.    Beaumont Health - Dearborn did not receive a capital DSH payment for the period under appeal.

## XVI.    Prisma Richland

166.    Prisma Richland was a safety net hospital physically located in Columbia, South Carolina a during the periods under appeal.

167.    Columbia was located within the Columbia, SC MSA and thus in an "urban area" for Medicare payment purposes during the periods under appeal.

168.    Thus, Prisma Richland was physically located in an urban area during the periods under appeal.

169.    Prisma Richland underwent a rural reclassification with an effective date of October 1, 2016, by application to CMS.  Therefore, although it remained physically in the Columbia, SC MSA, it was considered to be in the rural area of South Carolina as of that date.

170.    Prisma Richland did not receive a capital DSH payment for the periods under appeal.

## XVII.    UF Health Jacksonville

171.    UF Health Jacksonville was a safety net hospital physically located in

Jacksonville, Florida during the period under appeal.

172.    Jacksonville was located within the Jacksonville, FL MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

173.    Thus, UF Health Jacksonville was physically located in an urban area during the period under appeal.

174.    UF Health Jacksonville underwent a rural reclassification with an effective date of October 1, 2019, by application to CMS.  Therefore, although it remained physically in the Jacksonville, FL MSA, it was considered to be in the rural area of Florida as of that date.

175.    UF Health Jacksonville did not receive a capital DSH payment for the period under appeal.

### XVIII.   UF Health Shands

176.    UF Health Shands was a safety net hospital physically located in Gainesville, Florida during the period under appeal.

177.    Gainesville was located within the Gainesville, FL MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

178.    Thus, UF Health Shands was physically located in an urban area during the period under appeal.

179.    UF Health Shands underwent a rural reclassification with an effective date of October 1, 2019, by application to CMS.  Therefore, although it remained physically in the Gainesville, FL MSA, it was considered to be in the rural area of Florida as of that date.

180.    UF Health Shands did not receive a capital DSH payment for the period under appeal.

### XIX.    Spartanburg Medical Center

181.    Spartanburg Medical Center was a safety net hospital physically located in Spartanburg, South Carolina during the period under appeal.

182.    Spartanburg was located within the Spartanburg, SC MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

183.    Thus, Spartanburg Medical Center was physically located in an urban area during the period under appeal.

184.    Spartanburg Medical Center underwent a rural reclassification with an effective date of July 2, 2018, by application to CMS.  Therefore, although it remained physically in the Spartanburg, SC MSA, it was considered to be in the rural area of South Carolina as of that date.

185.    Spartanburg Medical Center did not receive a capital DSH payment for the period under appeal.

### XX.    Spectrum Health Butterworth

186.    Spectrum Health Butterworth was a safety net hospital physically located in Grand Rapids, Michigan during the period under appeal.

187.    Grand Rapids was located within the Grand Rapids-Kentwood, MI MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

188.    Thus, Spectrum Health Butterworth was physically located in an urban area during the period under appeal.

189.    Spectrum Health Butterworth underwent a rural reclassification with an effective date of June 30, 2017, by application to CMS.  Therefore, although it remained physically in the Grand Rapids-Kentwood, MI MSA, it was considered to be in the rural area of Michigan as of that date.

190.    Spectrum Health Butterworth did not receive a capital DSH payment for the period under appeal.

### XXI.    St. John Medical Center

191.    St. John Medical Center was a safety net hospital physically located in Westlake, Ohio during the period under appeal.

192.    Westlake was located within the Cleveland-Elyria, OH MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

193.    Thus, St. John Medical Center was physically located in an urban area during the period under appeal.

194.    St. John Medical Center underwent a rural reclassification with an effective date of February 8, 2021, by application to CMS.  Therefore, although it remained physically in the Cleveland-Elyria, OH MSA, it was considered to be in the rural area of Ohio as of that date.

195.    St. John Medical Center did not receive a capital DSH payment for the period under appeal.

### XXII.    St. Joseph Medical Center

196.    St. Joseph Medical Center was a safety net hospital physically located in Reading, Pennsylvania during the period under appeal.

197.    Reading was located within the Reading, PA MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

198.    Thus, St. Joseph Medical Center was physically located in an urban area during the period under appeal.

199.    St. Joseph Medical Center underwent a rural reclassification with an effective date of June 29, 2017, by application to CMS.  Therefore, although it remained physically in the

39

Reading, PA MSA, it was considered to be in the rural area of Pennsylvania as of that date.

200.    St. Joseph Medical Center did not receive a capital DSH payment for the period under appeal.

### XXIII.  St. Vincent's Medical Center

201.    St. Vincent's Medical Center was a safety net hospital physically located in Bridgeport, Connecticut during the period under appeal.

202.    Bridgeport was located within the Bridgeport-Stamford-Norwalk, CT MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

203.    Thus, St. Vincent's Medical Center was physically located in an urban area during the period under appeal.

204.    St. Vincent's Medical Center underwent a rural reclassification with an effective date of July 6, 2021, by application to CMS.  Therefore, although it remained physically in the Bridgeport-Stamford-Norwalk, CT MSA, it was considered to be in the rural area of Connecticut as of that date.

205.    St. Vincent's Medical Center did not receive a capital DSH payment for the period under appeal.

### XXIV.  Hospital of Central Connecticut

206.    Hospital of Central Connecticut was a safety net hospital physically located in New Britain, Connecticut during the period under appeal.

207.    New Britain was located within the Hartford-East Hartford-Middletown, CT MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

208.    Thus, Hospital of Central Connecticut was physically located in an urban area during the period under appeal.

209. Hospital of Central Connecticut underwent a rural reclassification with an effective date of June 25, 2019, by application to CMS. Therefore, although it remained physically in the Hartford-East Hartford-Middletown, CT MSA, it was considered to be in the rural area of Connecticut as of that date.

210. Hospital of Central Connecticut did not receive a capital DSH payment for the period under appeal.

### XXV. Cone Health

211. Cone Health was a safety net hospital physically located in Greensboro, North Carolina during the periods under appeal.

212. Cone Health was located within the Greensboro-High Point, NC MSA and thus in an "urban area" for Medicare payment purposes during the periods under appeal.

213. Thus, Cone Health was physically located in an urban area during the periods under appeal.

214. Cone Health underwent a rural reclassification with an effective date of July 14, 2016, by application to CMS. Therefore, although it remained physically in the Greensboro-High Point, NC MSA, it was considered to be in the rural area of North Carolina as of that date.

215. Cone Health did not receive a capital DSH payment for the periods under appeal.

### XXVI. Backus Hospital

216. Backus Hospital was a safety net hospital physically located in Norwich, Connecticut during the period under appeal.

217. Norwich was located within the Norwich-New London, CT MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

218. Thus, Backus Hospital was physically located in an urban area during the period

41

under appeal.

219.    Backus Hospital underwent a rural reclassification with an effective date of August 30, 2016, by application to CMS.  Therefore, although it remained physically in the Norwich-New London, CT MSA, it was considered to be in the rural area of Connecticut as of that date.

220.    Backus Hospital did not receive a capital DSH payment for the period under appeal.

### XXVII. UH Cleveland Medical Center

221.    UH Cleveland Medical Center was a safety net hospital physically located in Cleveland, Ohio during the period under appeal.

222.    Cleveland was located within the Cleveland-Elyria, OH MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

223.    Thus, UH Cleveland Medical Center was physically located in an urban area during the period under appeal.

224.    UH Cleveland Medical Center underwent a rural reclassification with an effective date of August 28, 2019, by application to CMS.  Therefore, although it remained physically in the Cleveland-Elyria, OH MSA, it was considered to be in the rural area of Ohio as of that date.

225.    UH Cleveland Medical Center did not receive a capital DSH payment for the period under appeal.

### XXVIII.    UH Geauga Medical Center

226.    UH Geauga Medical Center was a safety net hospital physically located in Chardon, Ohio during the period under appeal.

227.    Chardon was located within the Cleveland-Elyria, OH MSA and thus in an "urban

area" for Medicare payment purposes during the period under appeal.

228.     Thus, UH Geauga Medical Center was physically located in an urban area during the period under appeal.

229.     UH Geauga Medical Center underwent a rural reclassification with an effective date of January 4, 2021, by application to CMS.  Therefore, although it remained physically in the Cleveland-Elyria, OH MSA, it was considered to be in the rural area of Ohio as of that date.

230.     UH Geauga Medical Center did not receive a capital DSH payment for the period under appeal.

### XXIX.   UH Richmond Medical Center

231.     UH Richmond Medical Center was a safety net hospital physically located in Richmond Heights, Ohio during the period under appeal.

232.     Richmond Heights was located within the Cleveland-Elyria, OH MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

233.     Thus, UH Richmond Medical Center was physically located in an urban area during the period under appeal.

234.     UH Richmond Medical Center underwent a rural reclassification with an effective date of August 25, 2020, by application to CMS.  Therefore, although it remained physically in the Cleveland-Elyria, OH MSA, it was considered to be in the rural area of Ohio as of that date.

235.     UH Richmond Medical Center did not receive a capital DSH payment for the period under appeal.

### XXX.    Beaumont Health – Royal Oak

236.     Beaumont Health – Royal Oak was a safety net hospital physically located in Royal Oak, Michigan during the period under appeal.

43

237. Royal Oak was located within the Detroit-Warren-Dearborn, MI MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

238. Thus, Beaumont Health – Royal Oak was physically located in an urban area during the period under appeal.

239. Beaumont Health – Royal Oak underwent a rural reclassification with an effective date of September 21, 2016, by application to CMS. Therefore, although it remained physically in the Detroit-Warren-Dearborn, MI MSA, it was considered to be in the rural area of Michigan as of that date.

240. Beaumont Health – Royal Oak did not receive a capital DSH payment for the period under appeal.

### XXXI. Beaumont Health - Troy

241. Beaumont Health - Troy was a safety net hospital physically located in Troy, Michigan during the period under appeal.

242. Troy was located within the Detroit-Warren-Dearborn, MI MSA and thus in an "urban area" for Medicare payment purposes during the period under appeal.

243. Thus, Beaumont Health – Troy was physically located in an urban area during the period under appeal.

244. Beaumont Health – Troy underwent a rural reclassification with an effective date of September 20, 2016, by application to CMS. Therefore, although it remained physically in the Detroit-Warren-Dearborn, MI MSA, it was considered to be in the rural area of Michigan as of that date.

245. Beaumont Health – Troy did not receive a capital DSH payment for the period under appeal.

**XI.    Proceedings Below**

246.    Each Plaintiff timely filed an appeal with the Secretary's Board following the receipt of its final determination from its MAC or the MAC's failure to timely issue a final determination pursuant to 42 U.S.C. § 1395oo(a).  The Board assigned those case numbers 24-2226GC, 25-3514G, 25-3521GC, 25-3913GC, 25-4472GC, 25-4534G, 25-4715GC, 26-0311GC, and 26-0316GC. These cases are all group appeals formed pursuant to the applicable regulations and rules.

247.    On March 30, 2026, the Plaintiffs in all of these cases submitted a consolidated request that the Board grant EJR on the question of the validity of the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii), which bars hospitals that are geographically urban and reclassify as rural under 42 C.F.R. § 412.103 from receiving the capital DSH adjustment. Exhibits A, B.

248.    On March 31, 2026, within five business days of the March 30, 2026 EJR  request, the MAC filed an EJR response asserting that a substantive claim challenge would be filed in PRRB Case No. 25-3521GC.  On April 3, 2026, within five business days of the March 30, 2026 EJR request, the MAC filed an EJR response asserting that a substantive claim challenge would be filed in PRRB Case No. 25-4534G.  On April 6, 2026, within five business days of the March 30, 2026 EJR request, the MAC filed an EJR response asserting that substantive claim challenges would be filed in Case Nos. 24-4534G, 25-3514G, and 25-3913GC. On April 7, 2026, six business days after March 30, 2026, the MAC filed an Amended Response asserting that a substantive claim challenge would also be filed in Case No. 25-3521GC. Exhibit B.

249.    The MAC filed substantive claim challenges in the following case numbers related to the identified hospitals: (a) Case No. 25-3514G: Metropolitan Hospital and Spectrum Health Butterworth; (b) Case No. 25-3521GC: St. John Medical Center, UH Cleveland Medical Center,

45

UH Geauga Medical Center, and UH Richmond Medical Center; (c) Case No. 25-3913GC: Flagler Hospital (FY 2020), UF Health Jacksonville, and UF Health Shands; and (d) Case No. 25-4534G: Mayo Clinic Arizona, Flagler Hospital (FY 2018), Cone Health (FY 2018), Prisma Richland (FYs 2017 & 2018).  Exhibit B.

250.    On April 24, 2026, the Board granted EJR in Case Nos. 24-2226GC, 25-4472GC, 25-4715GC, 26-0311GC, and 26-0316GC.   Exhibit A.   The Board concluded in this EJR determination that it had jurisdiction over the matter for the subject years and lacked the authority to decide the legal question of whether 42 C.F.R. § 412.320(a)(1)(iii) is valid.  The Board made no findings of substantive claim violations in these cases.  Exhibit A.

251.    On May 7, 2026, the Plaintiffs in Case Nos. 25-3514G, 25-3521GC, 25-3913GC, and 25-4534G responded to the MAC's substantive claim allegations and submitted a request that the Board also grant EJR on the question of the validity of the Secretary's substantive claim regulations at 42 C.F.R. §§ 413.24(j) and 405.1873.  Exhibit B.

252.    On June 5, 2026, the Board issued its EJR ruling related to Case Nos., 25-3514G, 25-3521GC, 25-3913GC, and 25-4534G and granted EJR for all of the Plaintiffs in all cases on the issue of the validity of 42 C.F.R. § 412.320(a)(1)(iii).  The Board granted EJR on the validity of the substantive claim regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 for all of the hospitals for which the MAC asserted substantive claim violations. Exhibit B.

253.    As of the filing of this Complaint, the Board's decisions have not been reversed, affirmed, modified, or remanded by the Administrator.  The Board's EJR decisions constitute the Secretary's final agency actions in these cases.  By filing this Complaint, the Plaintiffs have timely sought appeal of the Secretary's final decision under 42 U.S.C. § 1395oo(f)(1).

## COUNT I

### Violations of the Medicare Statute — Capital DSH Payments

254. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

255. The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law… [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

256. Accordingly, as set forth below, the capital DSH regulation at 42 C.F.R. § 412.320(a)(1)(iii) must be held unlawful and set aside.

257. The Medicare statutory provision permitting hospitals to obtain "acquired" rural status at 42 U.S.C. § 1395ww(d)(8)(E) does not, standing alone, give CMS the authority to treat hospitals with "acquired" rural status as rural for capital DSH purposes. Section 1395ww(d)(8)(E) expressly applies only to subsection (d), which addresses operating, not capital, costs.

258. The Secretary has previously acknowledged this fact in the context of direct graduate medical education payments, as described above. *See* 70 Fed. Reg. at 47437; 72 Fed. Reg. at 47392, 47395–96, 47399.

259. The Secretary must adhere to the plain meaning of Subsection (d), as he has been instructed by the courts and acquiesced to in regulation. *See Geisinger*, 794 F.3d at 395; *Lawrence + Mem'l Hosp.*, 812 F.3d at 266; 81 Fed. Reg. at 23433–34.

260. Similarly, the Secretary must also adhere to the plain meaning of Subsection (g),

which requires that its capital cost prospective payment system be tied to a hospital's capital costs. And specific to any payment adjustments, such as capital DSH, the Secretary must "take into account variations in the relative costs of capital."  42 U.S.C. § 1395ww(g)(1)(B)(ii).

261.    The Secretary himself acknowledges that, though his authority is broad, he still must adhere to the "broad governing principles," which first and foremost require that the payment system relate to cost.  72 Fed. Reg. at 47398.  The statute allows the Secretary discretion in three specific instances: 1) to adjust for relative costs of capital and construction for different types of facilities or areas in which they are located; 2) for exceptions generally related to capital obligations; and 3) adjustments to reflect hospital occupancy rate. None of these discretionary exceptions, as drafted or as implemented, relate to "acquired" rural status.  Rather, they all relate to potentially unique cost circumstances, and the Secretary has implemented several of these exceptions accordingly when it has found a cost-based reason to do so.

262.    The Secretary originally interpreted the statute by conducting an analysis of the capital costs various providers actually incurred and used this as a basis to formulate the system. He developed the concept of capital DSH because his analysis showed that it was a faithful proxy for reflecting the capital costs of safety net hospitals treating low-income patients.  56 Fed. Reg. at 43378–79.  This original interpretation of the statute was consistent with the statute's plain meaning.

263.    However, the application of the bar to the capital DSH adjustment at 42 C.F.R. § 412.320(a)(1)(iii) bears no relationship to a hospital's costs and therefore is inconsistent with the Secretary's grant of authority in the Medicare statute and must be struck down as unlawful.

## COUNT II

### Arbitrary and Capricious Agency Action — Capital DSH Payments

264.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

265.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious [or] an abuse of discretion."  5 U.S.C. § 706(2).  "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

266.    The regulation at 42 C.F.R. § 412.320(a)(1)(iii) is arbitrary and capricious and an abuse of discretion and is, therefore, invalid.  5 U.S.C. § 706(2).

267.    First, the capital DSH regulation is arbitrary and capricious and an abuse of discretion, because it is contrary to the applicable Medicare statutory provisions, as established immediately above in Count I.

268.    Second, the capital DSH regulation is arbitrary and capricious and an abuse of discretion, because its underlying rulemaking is fatally flawed.  The APA requires that an agency's rulemaking be "reasonable and reasonably explained." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 406 U.S. 29, 51–2 (1983); *Nat'l Tel. Co-op Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009).  In the 2006 rulemaking adopting 42 C.F.R. § 412.320(a)(1)(iii), the Secretary (a) inaccurately asserted that the adoption of the capital DSH rule merely restored the previously implemented policy and (b) failed to take into account relative costs of capital for various hospital types and areas of location, as required by the controlling capital cost statute at Subsection (g).

269.    In 2006, the Secretary offered two principal justifications for newly promulgating a regulation denying capital DSH to hospitals with acquired rural status.  First, the Secretary claimed that it was "historic policy" to consider these hospitals as rural under the capital prospective payment system.  And second, more broadly, the Secretary stated that, since the inception of its capital prospective payment system, it has always used the same geographic classifications for its capital and operating payment systems.  However, upon close review by the United States District Court for the District of Columbia, neither statement has proven accurate.

270.    In *Toledo Hosp. v. Becerra*, 621 F. Supp. 3d 13, 17 (D.D.C. 2021), Toledo Hospital challenged the MAC's decision to deny the capital DSH reimbursement following the effective date of the hospital's rural reclassification.  Toledo Hospital contended the Secretary's 2006 rulemaking was arbitrary and capricious because 42 C.F.R. § 412.320(a)(1)(iii), the rule upon which the MAC's denial relied, failed to "take into account" the relative costs of capital as required by Section 1886(g) of the Medicare Statute.  *Toledo Hosp.*, 621 F. Supp. 3d at 24.  The Court agreed, acknowledging that Section 1886(g) "requires the Secretary to 'take into account' variations in relative capital costs."  *Id.* at 30.

271.    In reaching its decision, the Court rejected the Secretary's argument that the agency had an "historic policy" of treating hospitals with acquired rural status as rural for capital payment purposes, instead concluding that the "regulatory history is unclear, and past practice cuts against the Secretary's contentions."  *Id.* at 26.  Notably, the Secretary conceded that "he 'did not address explicitly through rulemaking whether [rural reclassified] hospitals were eligible for Capital DSH until 2006.'"  *Id.*  As the sole support for the supposed historic policy, the Secretary relied on some errant cross-references between some of his regulations that changed over time.  *See id.* at 26-27.  Unpersuaded, the Court explained that to the extent that archeological cross-

references could establish a policy, a rulemaking in 2004 "removed the … cross-reference entirely, thereby eliminating any link between the capital DSH adjustments" and status as a rural reclassified hospital. *Id.* at 27.

272.    The Court also rejected the Secretary's argument that the agency had a steadfast rule to treat geographic classifications within operating and capital payment systems the same. *See id.* at 26-27. Rather, according to the Court, no regulation "explicitly stated that the [rural] reclassification scheme was tied to capital DSH adjustments, or that classifications under the two schemes [operating and capital PPS] were uniform." *Id.* at 27. The Court's review of the regulatory history instead "reveal[ed] that the agency was concerned more with cost correlation between the operating and capital PPS, rather than classification consistency." *Id.* at 28.

273.    The agency's "actual practice" was likewise unsupportive of the Secretary's position, with the Court noting that "at least one . . . reclassified rural hospital that requested the capital DSH adjustment received an adjustment." *Id.* In other words, in stark contrast with statements made by the Secretary in the rulemaking, the Court concluded that the Secretary had neither a policy nor a practice of denying capital DSH reimbursements to hospitals with acquired rural status.

274.    Finding no evidence of an agency policy or practice, the Court examined whether any evidence existed that the Secretary nonetheless considered "the relative costs of capital for hospitals, like Toledo Hospital, that had reclassified as rural . . . but are physically located in an urban area." *Id.* at 29. The record was absent of any "evidence that the agency took these costs into account, either in 1991, 2000, 2004, or 2006." *Id.* This omission was inconsistent with the statute, which instructs that the Secretary "must take relative costs 'into account' to some degree in determining adjustments to the capital PPS system." *Id.* at 30.

51

275. Accordingly, the Court held that the 2006 rulemaking that promulgated 42 C.F.R. § 412.320(a)(1)(iii) "was arbitrary and capricious. Thus, [42 C.F.R. § 412.320(a)(1)(iii)] is unreasonable and cannot be relied upon to deny . . . the capital DSH adjustment." *Toledo Hosp.*, 621 F. Supp. 3d at 30.

276. Despite concluding that 42 C.F.R. § 412.320(a)(1)(iii) was arbitrary and capricious, the Court did not vacate the rule, because Toledo Hospital "[could] not directly challenge the rule under the APA because the six-year statute of limitations [had] lapsed." *Toledo Hosp.*, 621 F.Supp.3d at 30. Instead, the Court could only "'hold unlawful and set aside [the] agency action' that [was] unlawful," *i.e.*, the application of the regulation to the plaintiff. *Id.* (internal citation omitted).

277. The Secretary initially filed a notice of appeal in the *Toledo Hosp.* case on November 29, 2021. However, he ultimately relented and withdrew his appeal on December 30, 2021. The decision in *Toledo Hosp.* is therefore the final, binding decision that directly determines the outcome of this matter as well.

278. Subsequently, in response to the *Toledo* decision, the Secretary adopted prospective revisions to 42 C.F.R. § 412.320(a)(1)(iii) in its Fiscal Year 2024 Hospital Inpatient PPS Final Rule. Medicare Program: Hospital IPPS Fiscal Year 2024 Payment Rates & Policy Changes, 88 Fed. Reg. 58,640, 59,117, 59,334 (Aug. 28, 2023). Specifically, for discharges on or after October 1, 2023, hospitals reclassified as rural under § 412.103 will no longer be considered rural for purposes of determining capital DSH eligibility. *Id.* Instead, for purposes of § 412.320, the geographic classifications specified under § 412.64 will apply. *Id.* However, for the period under appeal, CMS and its contractors have and will continue to apply the 2006 regulation, denying capital DSH to the Plaintiffs for the periods at issue.

279.    For all the same reasons that the *Toledo Hosp.* court set aside the regulation as applied to the plaintiff in that case, so, too, here, the Court should set aside the regulation and instruct the Secretary to pay the Plaintiffs their capital DSH.

## COUNT III

### Violation of the Medicare Statute — Board Authority

280.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

281.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

282.    The regulation at 42 C.F.R. § 405.1873, which incorporates 42 C.F.R. § 413.24(j), expressly precludes the Board from determining the amount of total reimbursement due the provider because, if a provider does not claim the cost or file a protest item, "the specific item is not reimbursable, regardless of whether the Board further determines in such final hearing decision that the other substantive reimbursement requirements for the specific item are or are not satisfied." 42 C.F.R. § 405.1873(f)(1)(ii).  These provisions in turn could prevent a court from ordering payment if there is no protested item, which is contrary to provisions in 42 U.S.C. § 1395oo(f) that afford a provider the right to obtain judicial review of the Board's determination on total reimbursement due the provider or on any action resulting from a Board grant of EJR.

283.    The Secretary's regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are contrary to the Medicare statute, because the regulations impermissibly constrain the authority granted by

42 U.S.C. § 1395oo(a)(1)(A)(i) to the Board to decide a provider's dissatisfaction with "the amount of total program reimbursement due the provider." *Id.* Nowhere in that statute is there a requirement that a provider must include a claim or a protested amount for a specific cost on its cost report before payment related to that cost can be addressed by the Board.

284. For the reasons set forth above, the Court should strike down the regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 that expressly preclude the Board from determining the amount of total reimbursement due a provider as unlawful and contrary to the controlling statute at 42 U.S.C. § 1395oo.

## COUNT IV

### Arbitrary and Capricious Agency Action — Board Authority

285. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as if fully set forth below.

286. The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412.

287. The regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are arbitrary and capricious and an abuse of discretion and are, therefore, invalid. 5 U.S.C. § 706(2).

288. Congress granted to the Board the authority to decide issues brought to it by providers related to "the amount of the total program reimbursement due the provider" and the court the authority to review such Board decisions. 42 U.S.C. §§ 1395oo(a)(1)(A)(i), 1395oo(f). The Secretary's regulations prevent the Board from deciding the amount of total program

reimbursement due the provider and the court from reviewing such decisions on appeal.  When promulgating the regulation at 42 C.F.R. §§ 413.24(j) and 405.1873 the Secretary wholly failed to justify this break from the statute. *See Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776–77 (D.C. Cir. 2005).  The Secretary did not even acknowledge that its regulation would have such an effect. 80 Fed. Reg. at 70551–65, 70603–04.  Because the Secretary relied on factors that Congress has not intended him to consider and "entirely failed to consider an important aspect of the problem," the regulations are "arbitrary and capricious," as well as an abuse of discretion, and must be set aside under the APA.  *See State Farm*, 463 U.S. at 43.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request an Order:

1.      Declaring that the Secretary's regulation at 42 C.F.R. § 412.320(a)(1)(iii) is unlawful and must be vacated or, in the alternative, set aside as it relates to the Plaintiffs;

2.      Declaring that that the Plaintiffs are physically located in urban areas and therefore qualify for capital DSH payments, notwithstanding their acquired rural status;

3.      Declaring that the Secretary's regulations at 42 C.F.R. §§ 412.24(j) and 405.1873 that deny the Board's and Court's authority to decide appeals related to total program reimbursement paid to providers for issues not protested or claimed by providers are unlawful and must be vacated or, in the alternative, set aside as they relate to Metropolitan Hospital and Spectrum Health Butterworth in Case No. 25-3514G;  St. John Medical Center, UH Cleveland Medical Center, UH Geauga Medical Center, and UH Richmond Medical Center in Case No. 25-3521GC; Flagler Hospital (FY 2020), UF Health Jacksonville, and UF Health Shands in Case No. 25-3913GC; and Mayo Clinic Arizona, Flagler Hospital (FY 2018), Cone Health (FY 2018), Prisma Richland (FYs 2017 & 2018) in Case No. 25-4534G.

55

4.        Requiring the Secretary to recalculate Plaintiffs' capital DSH for the years under appeal;

5.        Awarding Plaintiffs their costs and fees incurred in this litigation to the extent permitted by law; and,

6.        Requiring the Secretary to pay Plaintiffs interest on the payments resulting from the Court's orders, pursuant to 42 U.S.C. § 1395oo(f)(2);

7.        Granting such other relief in law and/or equity as this Court may deem just and proper.

Dated: June 19, 2026

Respectfully submitted,

/s/ *Leslie Demaree Goldsmith*
Leslie Demaree Goldsmith
(DC Bar #422759)
Sarah B. Miller
(DC Bar #997286)
BASS, BERRY & SIMS, PLC
1201 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20004
Telephone: (202) 827-7083
leslie.goldsmith@bassberry.com
smiller@bassberry.com

*Attorneys for Plaintiffs*

50503823.2